CASE NO.  22-16881

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

DANIEL MARTIN, Plaintiff-Counter-Defendant-Appellant

v.

CLARK COUNTY, *et al*., Defendant-Counter-Claimant-Appellees

_____

On Appeal from the United States District Court for the District of Nevada
Case No. 2:19-cv-01623-APG-DJA Honorable Andrew P. Gordon

# **APPELLANT'S OPENING BRIEF**

James P. Kemp, Esq.
Nevada Bar No. 6375
KEMP & KEMP
7435 West Azure Drive, Suite110
Las Vegas, NV  89130
(702) 258-1183
Attorney for Appellant

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES...…………..…………………………………….......iv

JURISDICTIONAL STATEMENT…………………………………………..... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW…………… 2

STATEMENT OF THE CASE……..………………………………………….. 2

**I. <u>PROCEDURAL HISTORY</u>**………………….…………………...…2

**II. <u>STATEMENT OF FACTS</u>…**………………………………………….3

**<u>PLAINTIFF'S STATEMENT OF FACTS PURSUANT TO LR 56-1…</u>**……………………………………………………3

SUMMARY OF THE ARGUMENT………………………………………… 34

ARGUMENT…………………………………………………………………… 35

I. **<u>STANDARD OF REVIEW</u>**………………………………………….. 35

**A. The Court Reviews Summary Judgment De Novo…**……………35

**B. The District Court Failed to Follow the Summary Judgment Standard**……………………………………………………………36

**II. <u>THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS ON DANIEL'S CLAIMS</u>**………….37

**A. RETALATION UNDER THE OPPOSITION CLAUSE/ SECTION 1981/NRS 613.340…**……………………………………………37

**B. RETALIATORY HARASSMENT UNDER TITLE VII/42 U.S.C. § 1981/NRS 613.340…**……………………………………………43

**C. RACE DISCRIMINATION UNDER TITLE VII/42 U.S.C. § 1981/NRS 613.330…**……………………………………………..45

**D. PRETEXT**………………………………………………………..48

**III.** **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO CLARK COUNTY ON ITS CONTRACT COUNTERCLAIM BASED ON ILLEGALITY AND VIOLAION OF PUBLIC POLICY**……………………………………………………..50

CONCLUSION……………………………………………………….. 56

CERTIFICATE OF COMPLIANCE…………………………………. 58

## <u>TABLE OF AUTHORITIES</u>

## Cases

*Acosta v. Brain*, 910 F.3d 502, 514-515 (9th Cir. 2018) .................................. 43, 48

*Archuleta v. Corrections Corporation of America*, No. 2: 15-cv-01608-MMD-VCF (D. Nev. Jan. 29, 2021)......................................................39

*Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1363 (3d Cir. 1992). ....................................................................36

*Clark v. Columbia/HCA Info. Servs*., 117 Nev. 468, 480-81, 25 P.3d 215 (2001. 30, 51

*Coszalter v. City of Salem,* 320 F.3d 968, 977 (9th Cir. 2003) ........................ 39, 41

*Dawson v. Entek Intern.*, 630 F.3d 928, 937 (9th Cir. 2011). ...............................39

*Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018). .............................40

*Fielder v. UAL Corp.*, 218 F.3d 973, 984 (9th Cir. 2000).......................................43

*Flores v. City of Westminster*, 873 F.3d 739, 757 (9th Cir. 2017) ........................44

*France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015)......................................36

*Gay v. Waiters' and Dairy Lunchmen's Union*, 694 F.2d 531, 537 (9 Cir.1982)....45

*Gonski v. Second Judicial Dist. Court*, 245 P.3d 1164, 1172-73, 126 Nev. 551 (2010)................................................................ 30, 51

*Hochstadt v. Worcester Found. for Experimental Biology, Inc.,* 425 F.Supp. 318, 324-25 (D.Mass.)......................................................41

*Jurado v. Eleven-Fifty Corp.,* 813 F.2d 1406, 1412 (9th Cir. 1987). ............... 38, 55

*Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir.1996).............................................44

*Little v. Windermere Relocation, Inc*., 301 F. 3d 958, 969 (9th Cir. 2002)....... 37, 54

*Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000)............................................35

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05 (1973 ........................45

*McGinest v. GTE Serv., Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004 .....................36

*Nanty v. Barrows Co*., 660 F.2d 1327, 1331 (9 Cir.1981).....................................46

*National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 115-116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). .................................... 2, 33, 53

*Pope v. Motel 6*, 121 Nev. 307, 114 P.3d 277 (2005 ...................................... 37, 54

*Ray v. Henderson*, 217 F.3d 1234, 1244-45 (9th Cir.2000) .................................43

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)........................................................36

*Reynaga v. Roseburg Forest Products*, 847 F.3d 678, 686 (9th Cir. 2017). .... 37, 54

*Schindrig v. Columbia Machine, Inc.,* 80 F3d 1406, 1410 (9 Cir.), *cert. denied,* 117 S.Ct. 295 (1996).......................................................35

iv

*Vasquez v. County of Los Angeles,* 349 F.3d 634, 641 (C.A.9 (Cal.),2003). ... 46,48

*Wyatt v. Boston*, 35 F.3d 13, 15-16 (1st Cir.1994) ...................................................43

*Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) .......................................41

**Statutes**

28 U.S.C. §1331 ...........................................................................................................1

28 U.S.C. § 1441 .........................................................................................................1

42 U.S.C. § 1983 ......................................................................................................1, 34

42 U.S.C. § 2000e-3(a), ....................................................................................... 37, 54

42 U.S.C. §1981 ........................................................................................................8, 9

42 U.S.C.A. § 1981 ............................................................................................... 37, 54

NRS 613.330 ................................................................................................... passim

NRS 613.340 ................................................................................................... passim

**Other Authorities**

*EEOC Enforcement Guidance on Non-Waivable Employee Rights Under EEOC Enforced Statutes,* No. 915.002 (April 10, 1997)................................................51

Enforcement Guidance on non-waivable employee rights under EEOC enforced statutes | U.S. Equal Employment Opportunity Commission. ............................31

Harassment | U.S. Equal Employment Opportunity Commission (eeoc.gov)........32

**Rules**

28 U.S.C. §1291 ...........................................................................................................1

FRAP 3 .........................................................................................................................1

FRAP 4(a), ...................................................................................................................1

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this case pursuant to 28 U.S.C. §1331 in that it arises under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and 42 U.S.C. § 1983 The District Court also had supplemental jurisdiction pursuant to 28 U.S.C. § 1441 over related state claims alleged in the Second Amended Complaint [ECF No. 11 in District Court].

This appeal is from the adverse rulings against Appellant Daniel Martin on a Judgment (ECF No. 86; 1-ER-002), final order of the District Court entered November 15, 2022 (ECF No. 85; 1-ER-003-006) which granted summary judgment in part and denied it in part to all parties and awarded $1.00 nominal damages to Clark County on its breach of contract claim, final order  to Defendants, final order of the District Court entered 12/22/2021 (ECF No. 64; 1-ER-007-035) granting summary judgment to Defendants on all of Appellant Daniel Martin's claims and dismissing them with prejudice, and final order  entered 12/22/2021 (ECF No. 63; 1-ER-036-046) granting summary judgment to Clark County on liability only as to its breach of contract counterclaim. The Notice of Appeal was timely filed, in accordance with FRAP 4(a), on December 7, 2022. (ECF No. 88; 4-ER-736-738) The Court of Appeals has jurisdiction over the appeal pursuant to 28 U.S.C. §1291 and FRAP 3.

1

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the District Court misapplied the FRCP Rule 56 standard and erred in granting summary judgment on Daniel's claims of discrimination and harassment where A) the District Court failed to view the evidence in the light most favorable to Daniel and failed to draw all reasonable inferences in his favor; and B) impermissibly engaged in weighing evidence and making credibility judgments that favored Defendants, the moving party;

2. Whether the District Court misapplied the standard and erred in granting summary judgment to Clark County against Daniel on its breach of contract counterclaim in light of the fact that Daniel did nothing more than simply point to time-barred facts of claims that had been settled as mere background to his new post-settlement hostile work environment harassment claims as would seem to be contemplated under *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 115-116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

## STATEMENT OF THE CASE

### I. PROCEDURAL HISTORY

District Court granted Clark County's Motion for Summary Judgment against Daniel Martin and dismissed all of his claims against all Defendants below. (1-ER-007-035) District Court also granted Clark County's Motion for Summary Judgment on its counterclaim for breach of contract, but ultimately only awarded

2

$1.00 in nominal damages because Clark County had no proof of any other contract damages. (1-ER-003-006 and 036-046)

Daniel seeks reversal by the Court of Appeals and remand back to the District Court for trial.

## II. STATEMENT OF FACTS

### PLAINTIFF'S STATEMENT OF FACTS PURSUANT TO LR 56-1[1]

### A. FACTS PERTAINING TO MR. MARTIN'S CLAIMS

1. It is undisputed that Mr. Daniel Martin ("Daniel") was employed as a Juvenile Justice Probation Officer II ("JPO") at the Clark County Department Juvenile Justice Services' ("DJJS") Detention Center. It is further undisputed that he worked there from approximately June 1997 until approximately August 2015 when he was wrongfully terminated the first time and again from October 2015 to January 31, 2018. (2-ER-159 at ¶ 1)

2. It is undisputed that the County maintains a separate discipline track for time and attendance issues; however, this fact is immaterial to the issues in this case.

3. It is undisputed that one of Daniel's duties as a JPO was to ensure that youth in the detention center proceed orderly through the serving line in the kitchen. It is disputed that Daniel as a JPO was solely responsible for the youth getting

---

[1] 2-ER-158-248 is the Declaration of Daniel Martin, with attached exhibits, which is incorporated herein in its entirety by this reference, including those documents that are authenticated and incorporated by reference in the Declaration.

their meals in a safe and orderly fashion as there are many other components to this process that involve the youth, their families, the nurse at the facility, the kitchen staff, and others.  It is a team effort.  For example, the kitchen staff know that the youth at the end of the line have dietary restrictions and/or allergies and have responsibility to ensure that they are giving the correct trays to the youth—the kitchen staff is in the best position to know what the food contains. (2-ER-160 at ¶ 3)

4. It is undisputed that some youth in detention have allergies, including food allergies, or health conditions such as diabetes.

5. It is undisputed that the cooks at the detention center are required to know the youth on the special diet list and to prepare the correct meals for those youth, whom they work with at every meal every day during their work shifts. (Id.)

6. It is undisputed that a copy of the special diet list is placed at the front of the serving line in the kitchen.  It is also undisputed that the list is not always correct and that Daniel as a JPO who works with the youth in question on a daily basis knows the youth and their special dietary needs and allergies, and makes it a point to learn those of youth as soon as they are transferred into his unit, without the need to constantly refer to the list or read from it verbatim. (2-ER-160 at ¶ 7)

7. It is undisputed that the standard practice at the Detention Center is to position a

JPO at the head of the serving line as the youth pass through to get their trays. It is undisputed that this was Daniel's role for many years prior to August 17, 2017. Daniel enjoyed this role and was good at it and it was common knowledge that it was one of his favorite parts of the job because it gave him a chance to interact with the youth in a positive way. (2-ER-160 at ¶ 8)

8. It is undisputed that JPOs consult the special diet list as part of the team effort to ensure that the youth with special dietary needs get the correct tray. However, this is consulted prior to the JPOs and youths leaving their detention units (Unit E-3 in Daniel's case) to go to the dining hall. (2-ER-160 at ¶ 9) Further, it is undisputed that the special diet lists for Unit E-3 for the days in question held only three or four names of youth with dietary restrictions. (3-ER-536-538) It is further undisputed that the youth with the dietary restrictions who appear on the list are lined up at the end of the line so that everyone involved knows that they are the ones with special dietary needs and this includes the cooks and personnel in the kitchen. (2-ER-160 at ¶ 9) Daniel reviewed the list in the detention unit before each meal and had the listed restrictions and identities of the youth having restrictions memorized. (Id.) It is undisputed that there is no written policy or procedure set forth in Standard Operating Procedures that governs this process and that the process has been in a constant state of evolution for decades. (Id.; See 4-ER-718-721 Ex. 5 to Motion that

5

references a "wristband" system that was clearly no longer being utilized as of August 2017; 2-ER-156 at ¶ 21; 2-ER-142 at ¶ 11)  Thus it is disputed that it is the responsibility of the JPO alone to ensure that youth receive the correct tray, it is a team effort. (2-ER-160 at ¶ 9) Some JPOs, at the time in question, would read from the list and some would not. (See Ex. 7 to Motion video of lunch on 8/17/17 wherein a JPO that is NOT Daniel does not refer to the list which is on the counter of the serving line)  Some would have the youth call out their allergies or dietary needs to the kitchen staff and some JPOs would do that themselves. (2-ER-160 ¶ 9) There was no SOP. (Id.)  None.  There were rarely any problems with the individual processes followed by different JPOs. (Id.)

9. It is undisputed that on August 17, 2017 Daniel was working as a JPO and as he has done for many years positioned himself at the front of the serving line at breakfast.  It should be pointed out that Daniel was considered a "lead" and he chose to take this position at the head of the line because it was a task that he was good at and that he enjoyed very much in his interaction with the youth. (2-ER-161-62 ¶ 10) It was one of his favorite aspects of his job and this was well known to his superiors and his co-workers. (Id.; 2-ER-156 at ¶ 22) This becomes important in the context of the events that unfolded because an effective way to harass Daniel and emotionally upset him was to take away this duty. (Id.; 2-ER-161-62 at ¶ 10) It is undisputed that Marcus McAnally showed

6

up near the head of the line where Daniel was working that morning. (2-ER-161-62 at ¶ 10) McAnally is a racist and Daniel is black African-American. (Id.; 2-ER-147-48 at ¶¶ 4, 5, 6; 2-ER-140-44 at ¶¶ 5, 6, 7, 8, 9, 10, 15, 16, 17, 18, 19) McAnally had been sued by Daniel for discrimination, harassment, and civil rights violations in this District in case number 2:16-cv-2027−JCM−VCF. (2-ER-161-62 at ¶ 10) That case had been settled in February 2017 almost exactly six months prior to the events in question in the current case taking place. (3-ER-317-26) Since that time McAnally had continued to harass Daniel and Daniel had complained to his superiors about the continued harassment specifically including that McAnally (who was not Daniel's direct supervisor) would come to the dining hall to seek out Daniel to harass him. (5/25/17 8:58 a.m. Email from Daniel to Manager Dean Steiner at 3-ER-368 which states in part, "Supervisor McAnally has also been in the dining hall using intimidation tactics an inappropriately addressing officers in front of youths and other staff."; See also 2-ER-174-99 which includes other communications wherein Daniel complained about McAnally's ongoing pervasive harassment; See also (2-ER-161-62 at ¶ 10) Nothing was done to curtail McAnally's harassment of Daniel. (2-ER-161-62 at ¶ 10) No investigations or prompt remedial action was taken and this appears to be management's condoning and approving of McAnally's harassment of Daniel in retaliation for his earlier protected activity

7

of bringing charges of discrimination and retaliation to the EEOC and his bringing a lawsuit regarding those charges which were acts in opposition to illegal discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981, and NRS Chapter 613. (Id.)

10. There is a dispute. On August 17, 2017 Daniel did consult the special diet list. (2-ER-162-63 at ¶ 11) The list is consulted by Daniel when the youths are being lined up by another JPO to go to meals. (Id.) The lists are seldom more than a few names and Daniel works with the youths day-in and day-out and has the information on the lists memorized. (Id.) McAnally knows that this is the common practice and his interaction with Daniel on August 17 regarding the list was calculated harassment. (2-ER-162-63 at ¶ 11)

11. McAnally's interaction with Daniel on August 17 was calculated harassment and Daniel reported it to manager Dean Steiner as such that morning. (2-ER-162-63 at ¶ 12; 4-ER-723) It should be additionally noted that if the failure to read directly off of the list was such a concern that McAnally would have said something to Daniel while the youth were still moving through the line and not wait until they were gone; he would have, discreetly, told Daniel to do it while the youth were still there. (2-ER-162-63 at ¶ 12) The simple fact is that there is no policy or standard operating procedure governing how the information regarding allergies is conveyed to the kitchen staff and the entire process has

evolved over the years. (Id.; 2-ER-156 at ¶ 21) Reading off of a list that Daniel had memorized would not have made any difference. (2-ER-162-63 at ¶ 12) McAnally was simply harassing Daniel over a minor point for purposes of retaliation against Daniel for his protected activity of his 2016 lawsuit in which McAnally was a named defendant. (Id.)

12. It is undisputed that Daniel reported the August 17, 2017 harassment by McAnally to manager Dean Steiner by email within 40 minutes after it happened. (4-ER-723; 2-ER-163 at ¶ 13)  It is undisputed that this complaint, like so many others, was not properly investigated and no remedial action was taken. (2-ER-163 at ¶ 13) The context of Daniel having previously sued Clark County and McAnally for race discrimination, harassment, and retaliation and settled the case just six months prior must be considered for Title VII, NRS 613.330, and 42 U.S.C. §1981. (Id.)

13. It is undisputed that DJJS policy requires JPOs to follow "reasonable" orders and directives given by Supervisors.

14. There is a dispute.  On August 23, 2017 Daniel was working as a JPO and was positioned at the front of the serving line, as this is his usual duty, at breakfast and lunch meals. (2-ER-163-65 at ¶ 14) Daniel DID consult the special diet list and did convey the information that he found on the list to the kitchen staff at both lunch and dinner. (Id.) The Defendants know how this works and are

misrepresenting the facts. (Id.) Daniel has to consult the list and familiarize himself with the special dietary needs before each meal and BEFORE the youth are escorted from detention Unit E-3 to the dining hall. (2-ER-163-65 at ¶ 14) This is necessary to properly line up the youth for the walk to the dining hall to make sure that the youth are in the proper order in line with the special diet youth at the back of the line. (Id.) The video of the youth going through the line does not depict Daniel consulting and memorizing the information on the three special diet youth because it happened BEFORE Daniel and the youth arrived in the dining hall and the food line. (Id.) Defendants do not provide that video. Reading from the list is not necessary when Daniel knows exactly what the list contains. (Id.) There is NO POLICY OR PROCEDURE on this. (2-ER-163-65 at ¶ 14) Period. The Supervisor Meeting Minutes from March 15, 2017 (at 4-ER-721) do not say that it is required to read aloud from the list; indeed that document speaks to a system of "bracelets" to identify the special diet youth which by August 2017 had been completely abandoned. There simply was no standardized system. (2-ER-163-65 at ¶ 14) Further, the special diet lists are not always accurate. (Id.) Moreover, McAnally is not the only Supervisor and was not Daniel's direct Supervisor. McAnally was the "Duty Supervisor" on August 17, 2017. (Id.) He was not on August 23, 2017. As there was no policy or SOP on the topic of the allergy list, Daniel was not under any

particular directive or order to follow any particular procedure. (2-ER-163-65 at ¶14) Daniel asked McAnally on August 17, 2017 if McAnally could provide him with a copy of the policy or point out to him where the policy was and McAnally refused to do so. (Id.; 4ER-723) This called into question the reasonableness of McAnally's "order" as it may have been inconsistent with some other policy or SOP that Daniel was not aware of and it was quite reasonable for him to request that McAnally show him any written procedure that would be consistent with McAnally's order lest Daniel follow the order and as a consequence violate a policy or procedure. (2-ER-163-65 at ¶14) Again, the context of this was that the procedure was evolving (Id.; See 4-ER-719-21 discussing "bracelets" which were no longer used by August 2017) So Daniel would arguably be required to follow McAnally's order while working under McAnally as the Duty Supervisor on days when McAnally had that role. But McAnally has no business giving Daniel orders that could be inconsistent with policy or the orders of other supervisors or managers and Daniel would not have to follow McAnally's orders when working under other supervisors unless the order was consistent with or mandated by issued written policy or SOP. (2-ER-163-65 at ¶ 14) Daniel brought this potential conflict to the attention of manager Dean Steiner within an hour of his interaction with McAnally on August 17, 2017 (4-ER-723) and nobody ever confirmed to Daniel that there

was an actual policy or SOP governing the handling of the allergy (or special diet) list. (2-ER-163-65 at ¶14) Accordingly, on August 23 and 24 Daniel was neither violating any policy or procedure, nor was he being insubordinate to his own supervisor or the Duty Supervisor for that day. (Id.)

15. It is undisputed that on August 24, 2017 Daniel was working the head of the serving line at breakfast. (2-ER-165 at ¶ 15) It is undisputed that Jesse Navarro was the Duty Supervisor that day and that he was in the kitchen near the head of the serving line. (Id.) It is undisputed that Navarro did not give Daniel any orders about procedure involving the special diets list. (Id.)

16. It is undisputed that sometime between breakfast on August 23 and breakfast on August 24, 2017 a new youth had been moved from McAnally's Unit E-6 to Unit E-3 where Daniel was assigned and that this youth was a diabetic with a special diet. (2-ER-165 at ¶ 16) It was just one week after McAnally harassed Daniel in the kitchen over the special diet list. McAnally is the one who moved the diabetic youth into Daniel's Unit E-3. (2-ER-165 at ¶ 16) The video submitted by Defendants in Ex. 7 to Motion for Breakfast on August 24, 2017 shows at 7:21 a.m. the diabetic youth getting stepping up to the counter to get a tray of food. The diabetic youth had apparently intentionally been lined up incorrectly NOT at the end of the line where he should have been. (2-ER-165 at ¶ 16) The youth was brand new that morning and he was from the A side of E-

12

3 where Daniel did not work and was not responsible for lining up the diabetic youth. (Id.) So the diabetic youth was out of place and not at the end of the line where his special dietary needs would have been recognized. A reasonable jury could conclude from these circumstances that Daniel was set up. The Defendants have the video and know this. Their investigators would have reviewed this and known that this circumstance mitigates or exonerates Daniel especially when the video also shows Daniel leaving for an emergency bathroom break before all of the special diet youth had passed through the line and Jesse Navarro was responsible. The Defendants and their investigators suppressed this information and evidence and can be presumed under NRS 47.250 to have a guilty intent.

17. There is no dispute that the breakfast being served on August 24, 2017 contained items with added sugar.

18. There is a dispute. First, at breakfast on August 24, 2017 Daniel had consulted the special diet list when another JPO lined the youth up to go to breakfast and he had memorized the four youth that were on the list for Unit E-3. (2-ER-165-66 at ¶ 17; 4-ER-537-38Ex. 13 to Motion) Daniel did not line up the youths from the A Side of the unit to go to the dining hall, that task was performed by another E-3 JPO and it included the diabetic youth. (2-ER-165 at ¶ 17) Daniel did communicate with the kitchen staff regarding the special diet youth;

13

however, Daniel had an emergency need to use the restroom and he obtained permission from the Duty Supervisor Jesse Navarro to leave to use the restroom before all of the special diet list youth had gone through the line. (2-ER-165 at ¶ 17; 4-ER-567) Navarro monitored the line for Daniel while he used the facilities. (Id.; Ex. 7 to Motion video of Breakfast 8/24/17) Further, the diabetic youth in question apparently told Defendants' investigators that on the day he was given the wrong tray that the JPO a "tall African-American male who with glasses [an accurate description of Daniel] got into an argument with kitchen staff while in the DJJS Dining Hall serving line. [The youth] said that one of the kitchen staff was not listening when the Officer told him that [the youth] was diabetic and the cook gave him the wrong tray." (4-ER-559) A reasonable jury, on this alternative set of facts, could find and conclude that 1) Daniel Martin was not even present when the wrong tray was given to the diabetic youth because Daniel had an emergency and had gone to the restroom and it was Jesse Navarro that dropped the ball and let the youth get the wrong food tray, OR 2) that Daniel Martin had told the kitchen staff that the youth was a diabetic and needed a special tray and that in the heat of some argument with Daniel the kitchen staff ignored Daniel's informing the kitchen staff of the diabetic youth's special diet needs and gave the youth the wrong tray, either deliberately to get Daniel in trouble, or as a function of kitchen staff's own

negligence. Either way, Daniel was wrongly accused of being responsible for the youth getting the wrong food tray and the information establishing one or both of these scenarios is contained in the Investigative Report (4-ER-554-98) which DEFENDANTS COMPLETELY IGNORED![2] The court is reminded of its duty to view the facts, evidence, and all inferences in the light most favorable to Daniel.

23. It is undisputed that Daniel had an emergency and had to leave to go to the restroom at breakfast on August 24, 2017 and he obtained permission from the Duty Supervisor Jesse Navarro to do so. (2-ER-165-66 at ¶27) However, the phrase "As the last of the youth proceeded through the line" is ambiguous and Daniel clarifies that not all of the special diet list youth were through the line when he left to use the restroom with Jesse Navarro in charge of the special diet list. (Id.)

24. It is undisputed that one way or another it was discovered that the diabetic youth ate the wrong breakfast tray on August 24, 2017. The youth was tested by the nurse and administered some of his medication to reduce his blood

---

[2] Yet a THIRD scenario is revealed by studying the 8/24/17 breakfast video recording provided at Ex. 7 to the Motion. It appears that another E-3 JPO had incorrectly lined up the diabetic youth, who was new and unfamiliar to Daniel at that time, in the MIDDLE OF THE LINE instead of at the end per usual protocol. This was a curve ball that any JPO would have missed. It is conceivable that McAnally orchestrated this event as a "sting" operation on Daniel given McAnally's .

glucose level which was elevated.

25. It is undisputed that during a portion of the breakfast service on August 24, 2017 Daniel was in the restroom due to an emergency need to use the restroom. Daniel does not recall returning to the dining hall after using the restroom as the youth had departed for the detention unit to the best of his recollection. (3-ER-430 Depo of D. Martin at 59:1-7; 2-ER-165-66 at ¶ 27)

26. It is undisputed that Daniel had a meeting with his direct supervisor Savanah Jaime on August 29, 2017. (2-ER-166 at ¶ 28) It is disputed that this constituted a "one-to-one" meeting because JPOs Dana DeHesa, Vickie Meredith, and Churchill Odia were present at the time. (Id.; 3-ER-442-43 at 71:22-72:2) It is further disputed that Jaime gave Daniel "a written direction to not be at the front of the serving line." (3-ER-441-451 at 70:5-80:11) Daniel contends that when Jaime spoke to him about being at the front of the serving line that she made a suggestion that he not be up there if there were going to be disagreements and issues with the kitchen staff. (Id.) The document in context mentions "To relieve these issues…" and has nothing to do with the diabetic youth incident. (2-ER-166 at ¶ 28) Further, Daniel contends that the document was edited after he had signed it. (Id.; 3-ER-441-451 at 70:5-80:11) However, the document at Ex. 16 to Motion does by its terms suggest that the language about not being at the front of the serving line was only applicable if there were

going to be further "issues" with the kitchen staff. This is corroborative of Daniel's assertion that the item in the document did represent the suggestion that he had been given. Now, after the fact, it appears that Defendants are attempting to make this more of a directive or order than it was in order to bolster their position in litigation. It is undisputed that Daniel continued to work at the head of the serving line without incident as there were no further "issues" with the kitchen staff. This was because Daniel had not been given an order and these facts are in dispute. (2-ER-166 at ¶ 28)

27. It is undisputed that on August 30, 2017 Daniel worked the front of the serving line, but there is a dispute about the surrounding circumstances regarding this fact. (2-ER-166-167 at ¶ 29) Again, Daniel had not been given any directive or order by his supervisor. (Id.) It was merely a suggestion if there was going to be any further "issues" with the kitchen staff. (Id.) There had also been discussions about the continual harassment by McAnally and the suggestion was that Daniel give up one of his favorite parts of his job to avoid McAnally instead of his employer taking steps to protect him from racially motivated retaliatory harassment. (2-ER-166-67 at ¶ 29)

28. It is undisputed that on September 4, 2017, September 5, 2017, and September 13, 2017 Daniel worked the front of the serving line, but there is a dispute about the surrounding circumstances regarding this fact. (2-ER-167 at ¶ 30) Again,

17

Daniel had not been given any directive or order by his supervisor. (Id.) It was merely a suggestion if there was going to be any further "issues" with the kitchen staff. (Id.; 3-ER-545) There had also been discussions about the continual harassment by McAnally and the suggestion was that Daniel give up one of his favorite parts of his job in order instead of his employer taking steps to protect him from racially motivated retaliatory harassment. (2-ER-167 at ¶ 30)

29. It is undisputed that the DJJS has adopted procedures for investigating allegations of misconduct. It is undisputed that failure to cooperate or providing false or misleading information is grounds for termination under the policy and procedure.

30. It is undisputed that Richard Nelson and Danilo Chavarria were assigned to conduct an internal investigation into "Martin's alleged insubordination resulting in the diabetic youth receiving the standard meal tray." (2-ER-167 at ¶ 31) However, this "investigation" morphed into a "witch hunt" with an ever-expanding scope of inquiry as Defendants embarked more on a mission to find justification for their objective of firing Daniel. (Id.) This included repeatedly questioning Daniel including later interrogations that were hostile and bullying in their tone and demeanor which a reasonable jury could conclude was designed to support a pretextual termination. (Id.) Daniel's representatives at

the interrogations were interfered with in violation of NRS 289.080(3) in their attempt to question and clarify matters showing that the purpose was to achieve the goal of terminating Daniel's employment rather than conduct an impartial inquiry. (2-ER-167 at ¶ 31) The "investigators" who were not impartial or independent of the Defendants, and were in fact employees and partisans under control of the Defendants in this case, claimed that they were the sole arbiters of whether Daniel was failing to cooperate, or being false or misleading. (Id.)

31. It is undisputed that Daniel was interrogated by Chavarria and Nelson on October 19, 2017 and the interrogation was recorded.

32. It is undisputed that Daniel was advised, and acknowledged, that dishonesty in the interrogations would be grounds for termination of his employment.

33. With respect to the October 19, 2017 interview, the recording of that interrogation speaks for itself and Daniel requests that the court listen to that interview, and indeed all of the interviews that were recorded in their entirety. The interrogations reveal the biased and results driven approach that Defendants took in their investigation. (2-ER-167 at ¶ 32) The hearsay "Report and Investigative Findings" in Exhibit 19 to the Motion is also filled with biased statements, inuendo, and lacks objectivity that one would expect from an impartial search for the truth. And for the record Plaintiff objects to the Exhibit 19 document on the basis of hearsay insofar as it is offered for the truth of the

matters asserted-although it may be admissible to show Defendants' bias and retaliatory motives in this case.  Further note that there are genuine issues of material fact because the Defendants, in Nixonesque fashion[3], "lost" all but six minutes of the audio recording an interview conducted on December 11, 2017. (4-ER-582)

34. It is undisputed that Daniel was interviewed multiple times regarding the same topics on occasions that were two to four months removed from the incidents in question. (2-ER-167-68 at ¶ 33) Daniel does pick up and read off of the special diet lists on some occasions and on some occasions he does it from his memory and the recordings of his interrogations reveal these statements. (Id.)  Daniel's recollection may not be crystal clear because he had performed the task of monitoring the head of the serving line twice a day (approximately 10 times per week) for more than a decade (so over 5,000 times). (Id.) Expecting Daniel to have photographic memory of every day so that he can recall exact specifics of each incident is clearly absurd. (2-ER-167-68 at ¶ 33) Defendants had the

---

[3] Note that the 12/11/17 recording appears to have been edited as it is a different file format "WMA" as opposed to the "MP3" file format of the other recordings and the date of the computer file of the recording is 2/23/2018 whereas the other interview recordings show that they were created on the correct dates of the interviews.

video[4] of the days in question, but chose not to show it to Daniel for him to have his recollection refreshed and to provide the most accurate information. (Id.) This was clearly the setting of a trap (akin to a prosecutorial "perjury trap") and is consistent with Daniel's theory of the case that he was being retaliated against for his prior protected activities of an EEOC charge and a lawsuit alleging civil rights violations and race discrimination and harassment. A reasonable juror could decide in favor of Daniel on his theory of the case.

35. It is disputed that Daniel "did not actually pick up or read off the special diet list on August 24, 2017." First, as noted above, Daniel would review the list in detail while still in detention Unit E-3 before escorting the youth to the dining hall and Daniel was almost always personally familiar with each of the 3-4 youths who had dietary restrictions anyway. He had them memorized. As further noted above Daniel had left the serving line for an emergency trip to the bathroom and supervisor Jesse Navarro was in charge when the last of the special diet youths went through the serving line. The "breakfast" video referenced by Defendants does not show when Daniel reviewed the list prior to coming to the dining hall. It is also shows Navarro, who agreed to cover for Daniel, not checking the list when the youths were going through and getting

---

[4] It must be pointed out that the video recordings that have been produced do NOT have audio on them and in many instances Defendants claim that certain things were said and reflected on the video when such is utterly not true.

their food trays; Navarro does not look at the list until after all the youths had already gotten a tray. (Ex. 7 to Motion, Breakfast 8/24/17) Finally, the other videos also show Daniel referring to the list including on August 24, 2017 at 11:48:35 a.m. (Ex. 7 to Motion, Lunch 8/24/17) Daniel states unequivocally that he was not ordered by anyone to not work the front of the line on the dates at issue in this case. There was a "suggestion" by his supervisor to do so only if necessary to alleviate any tension between Daniel and kitchen staff, but that did not happen until approximately August 29, 2017. (2-ER-168 at ¶ 35)

36. As noted throughout, Daniel did not engage in any insubordination and the investigation was the product of retaliatory animus, including the fact that it was precipitated by McAnally, a racist, a manipulator, and a supervisor who had harassed and discriminated against Daniel for many years with no intervention from his employer despite numerous complaints and the fact that it was common knowledge in the workplace that McAnally had it in for Daniel. (2-ER-168-69 at ¶ 36) Again, the "Report and Investigative Findings" document (4-ER-554-598) is inadmissible hearsay when offered to prove the truth of the matters asserted. It was prepared by Defendants for use in litigation processes and it is peppered with bias and inappropriate supposition not supported by the facts and evidence. The videos generally do depict Daniel referring to the list and pointing out to the cooks which youths had special diets.

22

(Ex. 7 to Motion videos) There is no policy and no consistent procedure and even the biased investigation report notes several witnesses stating that reading from the list was not a uniform practice. (4-ER-578) The Supervisor Meeting Minutes (4-ER-719-21) reflect a system of using wristbands that was NOT being followed by August 2017 for example. There was simply no adopted written policy or Standard Operating Procedure that Daniel Martin violated and the video evidence does show that he generally followed the instructions of McAnally after August 17, 2017. It is disputed that Jaime ever gave Daniel written direction rather than a mere "suggestion" to not work the front of the line. The document itself suggests that this should only be done if necessary to alleviate any "issues" with the kitchen staff. After that point there do not appear to have been any other issues. Finally, it appears from Defendants' own evidence that Navarro was covering for Daniel on the serving line when some of the special diet youth got through the line. (Ex. 7 to Motion video Breakfast 8/24/17) (2-ER-168-69 at ¶ 36)

42. It is disputed that Daniel was "willfully untruthful in the investigation." He told the truth as best he could recall it. (2-ER-169 at ¶ 37) The investigation had the noted flaws. Daniel did note the allergies and the dietary restrictions of the youth for the time periods that he was at the head of the line at breakfast on August 24, 2017. (Id.) He had not been given a written directive to not work at

23

the front of the line by Jaime; he had been given a suggestion to alleviate issues with kitchen staff, which had resolved, and nothing about the diabetic youth was mentioned (Id.: See 4-ER-719-21) in the writing that Daniel contends was edited after he signed it. The authenticity of 4-ER-719-21 is objected to because it did not say anything about Daniel not working the front of the serving line when he signed the document. Daniel's recollection is that he did catch the problem with the diabetic youth getting the wrong tray and reported it. (2-ER-169 at ¶ 37) Daniel was asked about this situation almost two months after it happened and was doing his best to recall given that he had worked the front of the line for thousands of meals throughout his career as a Juvenile Probation Officer. (Id.) The court has standard jury instructions that include the following:

> Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

(Judge Gordon's standard civil jury instructions from court website) Accordingly, it is for the jury to decide if Daniel is telling the truth or if he was being "willfully untruthful" in his answers to investigators.

43. Daniel's alleged prior discipline involved a time period when he was not coming to work due to his workers' compensation injury. (2-ER-169-70 at ¶38)

This alleged prior discipline was never properly issued to Daniel and he disputes its authenticity. (Id.) Note that Exhibit 20 to the Motion 4-ER-598-611 does not contain Daniel's signature on any of the documents. Daniel disputes their authenticity. (Id.) Despite saying that there was an authenticating affidavit in Exhibit 20 to the Motion there is none. As a result of never receiving the documentation Daniel was denied due process in that he did not have notice and an opportunity to be heard. (2-ER-169-70 at ¶38) Moreover, this "discipline" while purporting to be generally related to attendance had nothing to do with Daniel's alleged "infraction" in running out to get some food between his first shift and the second where he agreed to help out DJJS by working a double shift on the date in question. (Id.) Being an alleged "no call-no show" is not of the same character as taking a quick break to get some food before your voluntary double shift. (Id.)

44. It is undisputed that Daniel had previously been wrongfully terminated and he had to be reinstated at a Step 2 grievance hearing. (2-ER-170 at ¶39) Daniel should never have been given the discipline related to his workers' compensation absences and he was denied due process in challenging them. Id. And again, those were alleged "no call-no show" absences for full shifts without available leave rather than taking statutorily required meal or rest breaks under NRS 608.019. (Id.)

45. The cited SOP regarding "Staff will not call for food delivery to be eaten in Detention Services nor leave the facility to get food" is a rule that is routinely not followed at DJJS and staff leave to get food frequently, particularly when they are staying on to help with voluntary overtime and working a double shift. (2-ER-170 at ¶40; 2-ER-157 at ¶24; 2-ER-144 at ¶20) Absence from duty without approved leave may be considered misconduct subject to discipline under DJJS policies, but state law requires that Daniel be permitted breaks and to eat food.  Under NRS 608.019 Daniel is to have 10 minutes paid breaks for each four hours that he works and when working a double shift he is required to have two 30 minute meal breaks. Department policy must yield to statutory law.  Again, leaving to get food is routinely done and not punished. (Id.)  Daniel being disciplined or fired because of this is proof of discriminatory and unequal enforcement of employment policies that has been found to be evidence of pretext.

46. It is disputed that on "August 21, 2017 while on-duty and without approval or communicating to a supervisor, [Daniel] left the detention center to get food" insofar as the date appears to be wrong. (2-ER-170 at ¶41) As to the substance, Daniel had implied approval though

custom and usage in that people working double shift overtime were recognized to be able to get something to eat prior to starting the second shift. (2-ER-170 at ¶40; 2-ER-157 at ¶24; 2-ER-144 at ¶20)

47. Daniel did not deny or dispute that he went to get Popeyes Chicken during 18 minutes of the transition from one shift to another while the youth were in lockdown. (2-ER-170-71 at ¶42) This is a common practice that employees are not disciplined for. (2-ER-170-71 at ¶40; 2-ER-157 at ¶24; 2-ER-144 at ¶20) It is actually kind of rude to impose discipline for this when the employee is "taking one for the team" and volunteering to work a double shift. (Id.)

48. It is undisputed that the County recommended the termination of Daniel's employment. The reason is in dispute as Daniel contends that his termination was for reasons of discrimination, harassment, and retaliation. (2-ER-171 at ¶43)

49. It is in dispute how the decision to recommend Daniel's termination came about. Daniel contends that it was motivated by retaliation by essentially all of the DJJS management including John "Jack" Martin the Director who had been a named defendant in Daniel's 2016 lawsuit and that Marcus McAnally took steps and communicated messages that were unfavorable to Daniel to influence and persuade

DJJS management to terminate Daniel's employment due to McAnally's personal racial bias and retaliatory motive. (2-ER-170 at ¶43) It is not in dispute that Clark County DJJS attempts to insulate and cover up the discrimination and retaliation by nominally having Whelihan, Banks, and Steiner be the "face" of the termination. (2-ER-170 at ¶43) However, it should be remembered that Daniel repeatedly brought his complaints of McAnally's harassment and discriminatory treatment to Dean Steiner and Steiner and Clark County did nothing of substance to investigate it or stop it. (Id; 2-ER-174-248 Ex 1 to Martin Decl.)

50. The assertion that McAnally and Jack Martin did not play any significant role in the recommendation to terminate Daniel's employment is disputed. (2-ER-171 at ¶43) Defendants John Martin and McAnally, the Director and Supervisor respectively, knowingly and/or recklessly permitted the disparate treatment of the Plaintiff and the discrimination and retaliation that he suffered to continue and took no steps to curtail or remedy the discrimination and retaliation. (Id.) Further, John Martin through his delegate terminated Plaintiff's employment on false and/or pretextual grounds and/or relied on a facially or as applied unconstitutional statute that denied the Plaintiff

due process of law under the 14th Amendment to the Constitution of the United States of America thereby unconstitutionally depriving him of his property and/or liberty interests in his employment under color of law.

51. It is undisputed that Daniel pursued his grievance to Step 3, arbitration, and that the arbitration had been set with Arbitrator Daniel Winograd for July 18, 2018. Daniel was not a dues paying union member and the Union would not pursue the arbitration on his behalf. Daniel was being requested to pay thousands of dollars of arbitration costs that he could not afford to pay and therefore he was forced to withdraw the arbitration grievance for financial reasons only. (2-ER-171 at ¶44)

52. It is undisputed that the formal discovery period ended on October 13, 2020; however, depositions continued through October 27, 2020 and information continues to come to light. The Declarations attached hereto are the mere tip of the iceberg and many other former DJJS employees with knowledge are eager to come forward.

## B. FACTS PERTAINING TO CLARK COUNTY'S COUNTERCLAIMS

1. It is undisputed that Daniel Martin (herein "Daniel") filed a previous lawsuit against the Defendants in the case including Counterclaimant Clark County,

29

Case No. 2:16-cv-2027-JCM-VCF (3-ER-302-316) because of long-term pervasive or severe harassment based on race, discrimination, and retaliation. The Complaint on file in that case and any amendments thereto speaks for itself.

2. It is undisputed that the parties engaged in a mandatory Early Neutral Evaluation (ENE) in the 2016 case and that the parties reached a settlement of that litigation in February 2017.

3. It is undisputed that the terms of the settlement of the 2016 case called for payment by Clark County to Daniel in the amount of $15,000.00 in return for a release of all EXISTING CLAIMS. (3-ER-318-326) The agreement did not waive liability for future statutory violations of Title VII of the Civil Rights Act of 1964 or NRS 613.330 as such a contractual waiver is not permitted under sound public policy and the law. *See Gonski v. Second Judicial Dist. Court*, 245 P.3d 1164, 1172-73, 126 Nev. 551 (2010) (an agreement that prospectively waives statutory rights and remedies is unconscionable and unenforceable).

4. The agreement speaks for itself, but the agreement is void as against public policy, illegal, and unenforceable to the extent that Clark County attempts to insulate itself from subsequent statutory violations of anti-discrimination and anti-retaliation statutes under state and federal law. *Id*.; *See Clark v. Columbia/HCA Info. Servs*., 117 Nev. 468, 480-81, 25 P.3d 215 (2001)

30

(Release agreements cannot release future claims that are not foreseeable or that would require a violation of public policy to enforce them)  Further, in his Reply to Counterclaims (DC ECF No. 49) in various placed including the FOURTEENTH AFFIRMATIVE DEFENSE Daniel asserts that the Counterclaim is illegal including because it is retaliation in violation of state and federal statutes which would include NRS 613.340 and 42 U.S.C. § 2000e-3(a).*See, e.g.*, *Jacques v. DiMarzio, Inc.*, 216 F. Supp. 2d 139,141-43 (E.D.N.Y. 2002) (defendant's counterclaims found *sua sponte* to be retaliatory, dismissal and sanctions issued *sua sponte*); see also Enforcement Guidance on non-waivable employee rights under EEOC enforced statutes | U.S. Equal Employment Opportunity Commission.  (Agreements that attempt to bar individuals from filing charges with the Commission or pursuing remedies for violations of Title VII or other anti-discrimination statutes "run afoul of the anti-retaliation provisions because they impose a penalty upon those who are entitled to engage in protected activity under one or more of the statutes enforced by the Commission.")  Daniel settled his earlier 2016 case in good faith and was entitled to believe that the prior illegal conduct of Clark County and its management would cease and that he would thereafter be able to work without further discrimination and harassment.  He was entitled to rely on the implication that Clark County and its management would in good faith stop

violating state and federal anti-discrimination and anti-retaliation laws.  Instead, Daniel suffered an unabated continuation, indeed and intensifying, of the illegal discrimination, harassment, and retaliation particularly by supervisor Marcus McAnally. (2-ER-139-173)

5.  It is undisputed that Daniel filed suit in this case after having filed a new charge of discrimination and retaliation with the EEOC.  It is undisputed that this new case does reference prior acts of discrimination that were the basis of the prior suit's contentions.  Again, Daniel cannot be precluded under strong public policy requirements from bringing a new charge of harassment/hostile work environment based on race under state and federal law.  "Harassment becomes unlawful where 1) enduring the offensive conduct becomes a condition of continued employment, or 2) the conduct is severe or ***pervasive*** enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive. Anti-discrimination laws also prohibit harassment against individuals in retaliation for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding, or lawsuit under these laws; or opposing employment practices that they reasonably believe discriminate against individuals, in violation of these laws." [Harassment | U.S. Equal Employment Opportunity Commission (eeoc.gov)](emphasis added)  Clark County cannot insulate itself from its continued harassment and

32

hostile work environment liability by preventing Daniel from relying on the previous acts that show its pervasiveness. Construing and enforcing the settlement agreement in this case in that manner would violate public policy and permit Clark County to potentially evade accountability for its continued violation of the law.

6. Moreover, plaintiffs in employment discrimination cases are permitted to raise as background facts matters that are no longer viable in terms of current liability. *See National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 115-121, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) (in harassment claims instances of harassment that fall outside of the statute of limitations period are admissible where they form a part of the pervasive harassment practice). In addition, the agreement does not state that prior acts cannot be used to support subsequent ***new claims*** that arise ***after*** the effective date of the agreement. To the extent that Clark County seeks such a construction the agreement is void as against public policy.

7. It is undisputed that the Second Amended Complaint discusses the history of Daniel's employment including his 2015 termination. This is merely background information that is admissible to provide context for the current claims that arose after the settlement of the 2016 case in February 2017. Clark County or its management personnel continued to engage in the illegal conduct,

the agreement cannot consistent with sound public policy prevent the new claims for subsequent conduct.

## SUMMARY OF THE ARGUMENT

This Court should reverse the grant of summary judgment and remand the case for trial on Daniel's claims.

At its core this is a case where the District Court simply did not follow the summary judgment standard. A reasonable jury could decide the issues in Daniel's favor. Therefore, the Court should reverse and remand the case for trial on Daniel's claims, except for his 42 U.S.C. § 1983 claim which he now abandons.

As to the summary judgment in favor of Clark County, even thought the court ultimately only awarded $1.00 in nominal damages, this court has an opportunity to clarify that a plaintiff in an employment discrimination civil rights case is not barred from using, as mere background facts to show pervasiveness, facts of earlier events of harassment that occurred in claims that were previously settled. The claims in this case were for SUBSEQUENT harassment and the prior facts pointed to were from claims that were not only settled, but were also time-barred. Daniel sued in this new case for what happened AFTER the settlement. He should be entitled to show the history notwithstanding the prior settlement.

## **ARGUMENT**

### I. **STANDARD OF REVIEW.**

#### **A. The Court Reviews Summary Judgment De Novo.**

This is an appeal from a final order granting summary judgment for Defendant-Appellee and against the Plaintiff-Appellant. Summary judgment is reviewed *de novo*. *Schnidrig v. Colombia Mach., Inc.*, 80 F.3d 1103, 1112 (9th Cir. 1996). On appeal, the Court views the evidence in the light most favorable to the nonmoving party and determines whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000).

> This Court has set a high standard for the granting of summary judgment in employment discrimination cases. Most recently, we explained that " '[w]e require very little evidence to survive summary judgment' in a discrimination case, 'because the ultimate question is one that can only be resolved through a "searching inquiry"-one that is most appropriately conducted by the factfinder, upon a full record.' " *Lam v. University of Hawaii,* 40 F.3d 1551, 1563 (9th Cir.1994) (quoting *Sischo-Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1111 (9th Cir.1991)).

*Schindrig v. Columbia Machine, Inc.,* 80 F3d 1406, 1410 (9 Cir.), *cert. denied,* 117 S.Ct. 295 (1996)

In the context of employment discrimination (and retaliation provisions), it is paramount to "zealously [] guard an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses."

*McGinest v. GTE Serv., Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004). "We have repeatedly held that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015) (string citation omitted).

The Supreme Court has gone so far as to say that when ruling on a motion seeking judgment as a matter of law a District Court may not weigh evidence and "***must disregard all evidence favorable to the moving party that the jury is not required to believe***." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). (Emphasis added)

## B. The District Court Failed to Follow the Summary Judgment Standard.

In this case the District Court erred in not following the above standard. Throughout the court's Order (1-ER-007-035) the standard is not followed. The court repeatedly avoided viewing the evidence in the light most favorable to Daniel.

For example, Daniel settled his first case with Defendants in February 2017. The District Court repeatedly stated that this was too remote from his January 2018 termination to be evidence of retaliation. HOWEVER, the retaliation and retaliatory harassment of Daniel actually took place in August 2017, nearly six months to the day after Daniel agreed to settle the case. It merely took from August 2017 to January 2018 for the Defendants' termination machinery to

accomplish the final adverse employment action-but it STARTED FIVE MONTHS EARLIER.  Moreover, the District Court ignored that it was Defendant McAnally, a defendant in the earlier case, who initiated the retaliation and harassment.

## II.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS ON DANIEL'S CLAIMS

### A. RETALATION UNDER THE OPPOSITION CLAUSE/ SECTION 1981/NRS 613.340.

Under the Opposition Clause of Title VII, 42 U.S.C. § 2000e-3(a), "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter."  The elements of a retaliation claim under the Opposition Clause are 1) Plaintiff's involvement in a protected activity, 2) an adverse employment action taken against him, and 3) a causal link between the two. *Little v. Windermere Relocation, Inc*., 301 F. 3d 958, 969 (9th Cir. 2002). Retaliation under NRS 613.340 is analyzed under its federal anti-discrimination law counterparts.  *Pope v. Motel 6*, 121 Nev. 307, 114 P.3d 277 (2005).  42 U.S.C.A. § 1981 is also governed by the same standards as Title VII.  *Reynaga v. Roseburg Forest Products*, 847 F.3d 678, 686 (9th Cir. 2017).  Retaliation claims are also recognized under § 1981 and courts generally analyze Title VII and Section 1981 claims the same, and "facts sufficient to give rise to a Title VII claim

are also sufficient for a section 1981 claim." *Jurado v. Eleven-Fifty Corp.,* 813 F.2d 1406, 1412 (9th Cir. 1987).

Daniel opposed discrimination against himself in his earlier EEOC charge that led to his 2016 civil action based on race discrimination, harassment, and retaliation. Daniel filed an EEOC/NERC charge which is clearly protected opposition conduct. He filed a lawsuit that is clearly protected opposition conduct. After settling the lawsuit based on the earlier charge in February 2017 in good faith, the Defendants permitted Defendant McAnally to continue to harass Daniel and despite Daniel's complaints (4-ER-723; 3-ER-317-26; 3-ER-368; 2:ER-174-260; (2-ER-158-173 at ¶¶ 10, 12, 13, 43) Defendants took no action to abate the harassment. McAnally is a known racist among employees at DJJS (2-ER-158-173; 2-ER-146-49; 2-ER-139-44)  He is known to have repeatedly and over a number of years created a hostile work environment for black employee, particularly Daniel. (2-ER-158-173; 2-ER-150-157; 2-ER-146-49; 2-ER-139-44) Six months after settling the case with Daniel, a time period that a reasonable jury could infer was calculated to attempt to throw off the scent of retaliation, Daniel was subjected to increased scrutiny and antagonism orchestrated by McAnally, falsely accused of transgressions, held to a different standard than other employees, including other white employees, and he was fired based on those premises. (Id.) That is an adverse employment action. Daniel contends that when considered in

context of the retaliatory motive for the prior administrative charge and lawsuit and the circumstances of McAnally's continued retaliatory harassment that the chain is unbroken and the firing (essentially six months after the settlement) constitutes close temporal proximity sufficient for a jury to infer the causal link between his protected activity and his adverse employment action of termination. Proximity in time between protected action and adverse action is certainly evidence of retaliation and can sometimes be sufficient on its own to show both the prima facie case and pretext. *Dawson v. Entek Intern.*, 630 F.3d 928, 937 (9th Cir. 2011). Recently, in another retaliation case, Chief Judge Du ruled that nine months was not too long to be evidence of retaliation and causation citing *Coszalter v. City of Salem,* 320 F.3d 968, 977 (9th Cir. 2003) (stating that "three to eight months is easily within a time range that can support an inference of retaliation" and cautioning against applying a mechanical rule in terms of how long is too long). *Archuleta v. Corrections Corporation of America*, No. 2: 15-cv-01608-MMD-VCF (D. Nev. Jan. 29, 2021). Obviously Defendants would not have been so foolish as to fire Daniel while his prior case was pending as that would obviously appear to be retaliatory. But a reasonable jury could decide that Defendants would settle the prior case and then remain "lying in wait" for a time interval to pass, say six months as it was here, and then move to retaliate against Daniel. During this time, McAnally was permitted to freely antagonize Daniel repeatedly (See 3-ER-317-26;

39

2-ER-158-73; 2-ER-174-260; 2-ER-150-57; 2-ER-139-44). McAnally had help from other supervisors at the end including Jaime, Ochoa, and Navarro. (2-ER-174-260) This type of "drumbeat of retaliatory animus" through a "pattern of antagonism" has been recognized as maintaining the chain of causation in retaliation cases:

> But an inference of causation is more easily drawn when one considers the facts as a whole. We recognized in *Grant* that "proof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment." 622 F.2d at 46; *see also Curcio v. Roosevelt Union Free Sch. Dist.,* No. 10-CV-5612 SJF AKT, 2012 WL 3646935, at *14 (E.D.N.Y. Aug. 22, 2012) (observing that a "pattern of antagonism" over the intervening period may be sufficient to demonstrate the requisite causal connection)…Because the burden for establishing a *prima facie* case of retaliation is "*de minimis,*" *Hicks v. Baines,* 593 F.3d 159, 164 (2d Cir. 2010), we conclude that Duplan's allegations are sufficient to survive at this stage.

*Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018).

Defendants' argument that the time lapse between Daniel's protected activities and his termination are too long to support a claim of retaliation consider the erudite words of the Court of Appeals that refutes the Defendants' contentions as a matter of law:

> Retaliation often follows quickly upon the act that offended the retaliator, but this is not always so. For a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable or until an especially hurtful action becomes possible. Or they may wait until they think the lapse of time disguises their true motivation. We should be particularly sensitive to this last point, for if we establish a per se rule that a specified time period is too long to support an inference of retaliation, well-advised retaliators

will simply wait until that period has passed. Then — provided that the retaliator has not revealed to others his intention, and has not provided demonstrably false or pretextual reasons for his act — he may retaliate with impunity. We therefore reject any bright-line rule about the timing of retaliation. ***There is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation. Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances***. In some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive; but the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment.

*Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003). The discharge of an employee approximately six months after he has settled a Title VII discrimination lawsuit, itself protected activity, based on a prior EEOC charge of discrimination which is undisputedly protected activity, when also coupled with a recent complaint of discriminatory harassment, is sufficient to establish causation in a retaliation case in the Ninth Circuit. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).(Citing with approval a case that is strikingly on point with Daniel's case where initiation of the discharge occurred six months after the settlement of a Title VII sex discrimination case and one month after an internal complaint to the employer about a discriminatory poor performance evaluation.

"*See Hochstadt v. Worcester Found. for Experimental Biology, Inc.,* 425 F.Supp. 318, 324-25 (D.Mass.) (holding that discharge six months after EEOC settlement

and a month after an informal complaint satisfies causation requirement), *aff'd,* 545 F.2d 222 (1st Cir.1976).")

In Daniel's case his 2016 civil action in this court was settled in February 2017. (4-ER-317-26)  Six months later in August 2017 McAnally ramped up his harassment and "birddogging" campaign and used his position as a supervisor to retaliate against Daniel and push the issues that led to Daniel's discharge from DJJS.  McAnally did this with the intent to retaliate and settle the score for Daniel suing DJJS and McAnally personally in the 2016 civil action or race discrimination, harassment, and retaliation in violation of Title VII and Section 1981.  Daniel, who had complained about McAnally's race based harassment and retaliation a number of times from just after his 2016 civil action settled through December 2017- March 8, 2017 through early December he continued to complain- (See 3-ER-368, 4-ER-723; 2-EF-174-260), on August 17, 2017 immediately after McAnally harassed him (See also 2-ER 139-44 at ¶ 11-12) again directly complained to DJJS manager Dean Steiner that he was being harassed by McAnally (3-ER-368).   Steiner did nothing.   The audio recordings of the interviews with Daniel reveal that he had also continued to complain about McAnally's harassment all the way up through the investigation of the August 2017 events.   There are clearly disputed material facts which make summary judgment inappropriate and a trial will be needed.

Finally, the Defendants' protestations that McAnally was not the termination decision maker, it is clear that he was driving the boat and heavily influencing the decision. His intimate involvement is sufficient to invoke the cat's paw theory which applies in retaliation cases. *Acosta v. Brain*, 910 F.3d 502, 514-515 (9th Cir. 2018).

The Defendants' purported "legitimate non-discriminatory reasons" for terminating Daniel's employment are disposed of in the Pretext section below. A reasonable jury could infer retaliation from these facts and Daniel has set forth a prima facie case. The Motion for Summary Judgment should be denied.

## B. RETALIATORY HARASSMENT UNDER TITLE VII/42 U.S.C. § 1981/NRS 613.340.

We agree with our sister circuits. Harassment is obviously actionable when based on race and gender. Harassment as retaliation for engaging in protected activity should be no different—it is the paradigm of "adverse treatment that is based on retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." EEOC Compliance Manual ¶ 8008.

*Ray v. Henderson*, 217 F.3d 1234, 1244-45 (9th Cir.2000) Toleration of harassment by other employees is considered an adverse employment action for purposes of retaliation and a retaliatory harassment claim is recognized even where the result is not the ultimate adverse action of discharge. *Fielder v. UAL Corp.*, 218 F.3d 973, 984 (9th Cir. 2000). *Citing and quoting Wyatt v. Boston*, 35 F.3d 13, 15-16 (1st Cir.1994) and *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th

43

Cir.1996) ("Nothing indicates why a different form of retaliation-namely, retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII-does not fall within the statute.") The facts in this case clearly implicate retaliatory harassment by McAnally that was not only tolerated by DJJS management it was encouraged and allowed to flourish despite Daniel's pleas for help because it was aligned with DJJS's own goals of drumming Daniel out of the department. But recall that in retaliatory harassment the termination is irrelevant and general compensatory damages and punitive damages will be available even in the absence of economic damages such as lost wages.

McAnally and John Martin are individually liable under Section 1981. Individuals who violate 42 U.S.C. § 1981 for retaliatory conduct can be held personally liable for punitive damages "1) if they participated in the deprivation of Plaintiffs' constitutional rights; 2) ***for their own culpable action or inaction in the training, supervision, or control of their subordinates***; 3) for their acquiescence in the constitutional deprivations; or 4) for conduct that showed a reckless or callous indifference to the rights of others." *Flores v. City of Westminster*, 873 F.3d 739, 757 (9th Cir. 2017) (emphasis added). McAnally and John Martin cannot claim qualified immunity because it is well-settled and established, and beyond rational dispute, that supervisors and managers cannot engage in discriminatory and retaliatory conduct based on race or protected activity because of race such as

Daniel Martin's prior EEOC charge and his 2016 civil action in this court. In 2021 no one can be heard to say that they are unaware that they could be held liable for race discrimination and retaliation under Section 1981. Daniel repeatedly complained about the harassment he was being subjected to in the workplace and nothing was done to attempt to stop it by DJJS management or other officials at Clark County such as its Office of Diversity which was also informed of the harassment. (2-ER-174-260; 2-ER-158-73 at ¶10; 4-ER-723, 3-ER-368)

## C. RACE DISCRIMINATION UNDER TITLE VII/42 U.S.C. § 1981/NRS 613.330.

Title VII of the Civil Rights Act of 1964 makes discrimination by an employer on the basis of Race or Sex illegal and subjects a discriminating employer to civil liability under 42 U.S.C.A. § 2000e-2. In a disparate treatment case, the court applies the familiar prima facie case/non-discriminatory reason/pretext burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05 (1973). An individual is subject to disparate treatment when he is singled out or treated less favorably than others similarly situated because of his race and/or sex. *Gay v. Waiters' and Dairy Lunchmen's Union*, 694 F.2d 531, 537 (9th Cir.1982). A *prima facie* case can be established through direct evidence of intentional discrimination or circumstantial evidence that creates an inference that the employer's conduct was more likely than not

motivated by discrimination. *Nanty v. Barrows Co*., 660 F.2d 1327, 1331 (9th Cir.1981).

On his Title VII claim (and his Section 1981 and NRS 613.330 claims which are identical), Plaintiff must first make a *prima facie* case of disparate treatment. Plaintiff must show that: (1) he belonged to a protected class; (2) he was adequately performing his job; (3) he suffered an adverse employment action; and (4) one or more similarly situated employees not in his protected class received more favorable treatment. *Moran v. Selig* 447 F.3d 748, 753 (C.A.9 (Cal.),2006)

Daniel Martin is in a protected class, he is African-American. He was adequately performing his job when taking into account any job performance issues are pretextual and set forth herein. Daniel suffered the adverse employment action of termination on January 31, 2018.

Employees are similarly situated when they have the same supervisor, are subject to the same standards, and have engaged in the same conduct. *Vasquez v. County of Los Angeles,* 349 F.3d 634, 641 (C.A.9 (Cal.),2003) (Citing *Hollins v. Atlantic Co., Inc.,* 188 F.3d 652, 659 (6th Cir.1999). The white employees that Plaintiff identifies as comparators are sufficiently similarly situated as to be valid comparators and Daniel was definitely treated less favorably and likewise his witnesses all point to white co-workers of Daniels who were treated more favorably and that a racist culture permeated DJJS from its management down.

(See 2-ER-158-173; 2-ER-150-157; 2-ER-146-49; 2-ER-139-44) Plaintiff identifies the following comparators who were treated more favorably: Marcus McAnally who engaged in repeated acts of dishonesty as related by Joseph Whitaker including lying in an investigation of a pepper spraying incident and McAnally's lying about completing POST certification training when he had not done so. (2-ER-150-157 at ¶19-20); Joseph Whitaker who relates that he, a white Caucasian JPO who would leave to get food between shifts when working a voluntary double shift without being disciplined for it. (2-ER-150-57 at ¶24); no other JPOs, black or white, were ever brought up for discipline regarding the handling of the special diet list because there simply was no policy or set procedure. Other JPOs are seen on the videos not reading from the list while the special diet youth at the end of the serving line pass through and get their food- Navarro is a supervisor and he does not read off the list while covering the line for Daniel at breakfast on August 24, 2017 (although he looks at it after the youth had all passed through and got their food. Daniel was simply not guilty of any insubordination in this case. There is a clear question of fact as to whether or not his supervisor Jaime gave him a directive or a mere suggestion as to his working the head of the line in the dining hall. The totality of the circumstances and the material facts are in sharp dispute in this case and summary judgment should be denied.

## D. PRETEXT

There is a tremendous amount of circumstantial evidence that race discrimination and retaliation were the but for cause of Daniel's termination. McAnally is a racist based on the evidence in Exhibits A, B, C, and D to the Opposition below. (2-ER-158-173; 2-ER-150-157; 2-ER-146-49; 2-ER-139-44) Those declarations have to be read in their entirety. McAnally is also the type of person who is predisposed to retaliate when he is confronted or challenged in a way that might make him look bad. (Id.) There is no question that McAnally was directly involved in the events that led to Daniel's termination. McAnally's fingerprints are all over the case. He is also a dishonest and conniving person based on the evidence. He is exactly the type of person that would engage in the "Cat's Paw" maneuver where a person with discriminatory or retaliatory animus manipulates or influences the decisionmaker to terminate the employment of the target of their discrimination or retaliation. *Acosta v. Brain*, 910 F.3d 502, 514-515 (9th Cir. 2018).

"A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez v. County of Los Angeles,* 349 F.3d 634, 641 (C.A.9 (Cal.),2003). Through the motives of McAnally, which DJJS management also had a clear motive to retaliate against Daniel for his earlier

discrimination charge and 2016 civil action, Daniel shows that discrimination and retaliation more likely motivated the termination.

Daniel was not insubordinate. He was not the cause of the diabetic youth getting the wrong tray as the youth was brand new to Unit E-3 that morning and he was lined up in the middle of the line instead of at the end. Daniel did not line him up wrong. Daniel had referred to special diet list back at the detention unit. Daniel was not present when the last of the special diet youth passed through the line because he had a restroom emergency. Jesse Navarro the supervisor took over for Daniel and did not read from the list as the last of the special diet youth went through the line. Daniel was singled out and targeted regarding his getting food between shifts. This is not something that JPOs get in trouble for. Again, the court must read the declarations (2-ER-158-173; 2-ER-150-157; 2-ER-146-49; 2-ER-139-44 all expressly incorporated herein). Additionally, this looks like it was a shifting reason that creates a question of fact under the case law. It appears that DJJS management knew from the videos and the interviews (even the youth said that Daniel read from the list, but that the cooks did not listen to him) that the diabetic youth getting the wrong tray was not going to hold up as a reason to fire Daniel. So they cast about and fabricated a reason from his getting food between his voluntary double shifts. DJJS employees do not get fired for that (Exs A,B,C,D) Defendants then set him up by questioning him long after certain events

49

when his memory was foggy while they had the benefit of video and after they had spoken to witnesses who were biased by their own fear of getting in trouble if they confessed to the same conduct as Daniel was accused of. It was easier for them to throw Daniel under the bus. And surely they did.

The proffered reasons for termination, are mere pretext and under the *McDonnell Douglas* shifting scheme, the pre-textual reason falls away and the inferences of discrimination and/or retaliation remain standing. A reasonable jury could rule in Daniel's favor in this case. Summary Judgment should be denied.

Summary judgment was erroneously granted and should be reversed.

## III. <u>THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO CLARK COUNTY ON ITS CONTRACT COUNTERCLAIM BASED ON ILLEGALITY AND VIOLAION OF PUBLIC POLICY</u>

Daniel's claims for race discrimination, harassment, hostile work environment, retaliation, and civil rights violations are for discreet unlawful actions by defendants ***after*** the settlement of the 2016 action took place or for an ongoing pervasive hostile work environment that Clark County, despite multiple complaints by Daniel (See Ex. A to ECF No. 58), deliberately or with wanton indifference to Daniel's right to workplace free from discrimination, retaliation, and harassment permitted or encouraged the unlawful conduct to continue unabated. (2-ER-158-173; 2-ER-150-157; 2-ER-146-49; 2-ER-139-44) Clark

County, as Daniel's employer violated its obligations under the law and Daniel has a right to hold Clark County to account for its violations.

The settlement agreement is void as against public policy, illegal, and unenforceable to the extent that Clark County attempts to insulate itself from subsequent statutory violations of anti-discrimination and anti-retaliation statutes under state and federal law. *See Gonski v. Second Judicial Dist. Court*, 245 P.3d 1164, 1172-73, 126 Nev. 551 (2010) (an agreement that prospectively waives statutory rights and remedies is unconscionable and unenforceable); *See Clark v. Columbia/HCA Info. Servs*., 117 Nev. 468, 480-81, 25 P.3d 215 (2001) (Release agreements cannot release future claims that are not foreseeable or that would require a violation of public policy to enforce them)  The statutory tort claims that Daniel has raised  in this 2019 action that arose after the February 2017 settlement of the 2016 action override Clark County's contract claims.  "Agreements that attempt to bar individuals from filing a charge or assisting in a Commission investigation run afoul of the anti-retaliation provisions because they impose a penalty upon those who are entitled to engage in protected activity under one or more of the statutes enforced by the Commission." *EEOC Enforcement Guidance on Non-Waivable Employee Rights Under EEOC Enforced Statutes,* No. 915.002 (April 10, 1997)

At least two of Daniel's legal theories in his Second Amended Complaint (set forth in several of the claims) fall within the protection of the illegality and public policy exceptions that prevent enforcement of the settlement agreement under the facts and circumstances presented by this case. These are 1) hostile work environment retaliatory harassment, and 2) retaliation with the adverse employment action of discharge. One or both of these subsequent claim theories open up the door to examination of the long and troubled history of Daniel's employment history and the discrimination, harassment, and retaliation he suffered over the many years of his career at DJJS.

First, a claim of hostile work environment harassment, which would also encompass retaliatory harassment with the added element of a prior protected activity (in this case the prior EEOC charge and the 2016 court action) requires examination of events and circumstances over a long period of time. The Supreme Court said it best:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348-349 (3d ed. 1996) (hereinafter Lindemann) ("The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existence"). The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. See *Harris* v. *Forklift Systems, Inc.,* 510 U. S. 17, 21 (1993) ("As we pointed out in *Meritor* [*Savings Bank, FSB* v. *Vinson,* 477 U. S. 57, 67 (1986),] `mere utterance of an . . . epithet which engenders offensive

feelings in a[n] employee,' *ibid.* (internal quotation marks omitted), does not sufficiently affect the conditions of employment to implicate Title VII"). Such claims are based on the cumulative effect of individual acts.

"We have repeatedly made clear that although [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition `is not limited to "economic" or "tangible" discrimination,' *Harris,* [510 U. S., at 21] (quoting *Meritor Savings Bank, FSB* v. *Vinson,* [477 U. S.,] at 64), and that it covers more than `terms' and `conditions' in the narrow contractual sense." *Faragher* v. *Boca Raton,* 524 U. S. 775, 786 (1998) (quoting *Oncale* v. *Sundowner Offshore Services, Inc.,* 523 U. S. 75, 78 (1998)). As the Court stated in *Harris,* "[t]he phrase `terms, conditions, or privileges of employment' [of 42 U. S. C. § 2000e—2(a)(1)] evinces a congressional intent `to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." 510 U. S., at 21 (some internal quotation marks omitted) (quoting *Meritor,* 477 U. S., at 64, in turn quoting *Los Angeles Dept. of Water and Power* v. *Manhart,* 435 U. S. 702, 707, n. 13 (1978)).[10] "Workplace conduct is not measured in isolation . . . ." *Clark County School Dist.* v. *Breeden,* 532 U. S. 268, 270 (2001) *(per curiam).* Thus, "[w]hen the workplace is permeated with `discriminatory intimidation, ridicule, and insult,' that is `sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris,* 510 U. S., at 21 (citations omitted).

*National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 115-116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

Sound public policy simply cannot permit an employer like Clark County to settle

a prior hostile work environment harassment claim, implying that it will refrain

from retaliation and further harassment, as required by law, and take care to ensure

that the employee giving the release can work in a workplace free from harassment

based on a protected classification and free from retaliation for his or her protected activity, and then turn around and permit further harassment amounting to a hostile work environment and retaliation while claiming the benefit of the release. This potentially thwarts the public policy behind Title VII and Section 1981 and similar state statutes because the employee would be barred from pointing to the years of prior illegal abuse that is the foundation for the post-release continuing violations.

Likewise, under the Opposition Clause of Title VII, 42 U.S.C. § 2000e-3(a), "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter." The elements of a retaliation claim under the Opposition Clause are 1) Plaintiff's involvement in a protected activity, 2) an adverse employment action taken against him, and 3) a causal link between the two. *Little v. Windermere Relocation, Inc*., 301 F. 3d 958, 969 (9th Cir. 2002). Retaliation under NRS 613.340 is analyzed under its federal anti-discrimination law counterparts. *Pope v. Motel 6*, 121 Nev. 307, 114 P.3d 277 (2005). 42 U.S.C.A. § 1981 is also governed by the same standards as Title VII. *Reynaga v. Roseburg Forest Products*, 847 F.3d 678, 686 (9th Cir. 2017). Retaliation claims are also recognized under § 1981 and courts generally analyze Title VII and Section 1981 claims the same, and "facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim." *Jurado v. Eleven-Fifty*

54

*Corp.,* 813 F.2d 1406, 1412 (9th Cir. 1987). Under Clark County's theory of its counterclaim it can retaliate with impunity because its settlement agreement should prevent Daniel from pointing back to his prior EEOC charge and the 2016 action which were protected activities under the first element of a retaliation claim. The third element of retaliation becomes problematic too because Clark County contends that Daniel cannot point to any of the long history prior to February 2017 that provides context and background that informs and paints the picture of the causal link between his protected activity and the post-settlement retaliation. Strong public policy considerations prohibit Clark County from using the settlement agreement as a sword in this manner. It has a chilling effect, it tends to thwart the enforcement of these important anti-discrimination employment laws, and it rewards bad faith and mendacity on the part of Clark County which never intended to make sure it was following the law and appears to have intended all along to retaliate against Daniel for his protected activity.

Again, it should be remembered that if Clark County had simply taken steps to make sure its management including Supervisor Marcus McAnally did not further retaliate against and harass Daniel and if Clark County had not itself engaged in retaliation by terminating Daniel's employment, then it would not have been sued for the subsequent claims set forth in the Second Amended Complaint

which permit Daniel to point to the prior EEOC charge and the 2016 action and the allegations set forth in that case.

The District Court distinguished the *Morgan* case from this case stating that the mere pointing to time-barred events is different from pointing to events that are both time-barred and pertain to previously released claims. The District Court does this on the theory that to fail to do so would discourage the settlement of disputes. But this is backwards. Employees who still work for employers or are reinstated should think long and hard about settling a case when they will not be able to point to time-barred and settled claims as factual background to prove post-settlement harassment. Employers are unlikely to agree to terms that do not include a complete release, similar to what was done in Daniel's earlier case—potentially opening the employer up to a breach of contract case for any alleged subsequent harassment. Thus, this court should recognize a public policy exception that does not prevent an employee who suffers later harassment or discrimination by the same employer from pointing to that earlier conduct without being accused of breach of contract as Daniel was here.

Summary Judgment should be reversed.

## **CONCLUSION**

Daniel Martin presented sufficient evidence to raise genuine issues of material fact on his claims. Summary judgment for Defendants was improper in

this case. Further the court below erred in finding liability against Daniel on Clark County's breach of contract claim (even though only $1.00 of damages was found) The judgment and order of the District Court should be reversed and this matter remanded for trial.

Date: _____ May 7, 2023

_____ /s/ James P. Kemp _____
James P. Kemp, Esq.
Nev. Bar No. 6375
Kemp & Kemp
7435 W. Azure Drive, Ste. 110
Las Vegas, NV 89130
Attorney for Appellant Daniel Martin

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____22-16881_____

      I am the attorney or self-represented party.
      **This brief contains** _____**13,973**_____ **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).
      I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
      [ ] it is a joint brief submitted by separately represented parties;
      [ ] a party or parties are filing a single brief in response to multiple briefs; or
      [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____/s/ James P. Kemp_____ **Date** _____**May 7, 2023**_____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

58